# IN THE SUPREME COURT OF CALIFORNIA

CIRO CAMACHO,

Petitioner,

v.

THE SUPERIOR COURT OF MERCED COUNTY,

Respondent;

THE PEOPLE,

Real Party in Interest.

S273391

Fifth Appellate District

F082798

Merced County Superior Court

146207

August 31, 2023

Justice Kruger authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Groban, Jenkins, and Evans concurred.

CAMACHO v. SUPERIOR COURT

S273391

Opinion of the Court by Kruger, J.

The Sexually Violent Predator Act (SVP Act; Welf. & Inst. Code, § 6600 et seq.) authorizes the involuntary commitment of certain convicted sex offenders — termed "sexually violent predators," or SVPs — who are found to have mental disorders that make them likely to reoffend after release from prison. This case concerns delays in holding trial on a petition for SVP commitment.

Petitioner Ciro Camacho was first determined to be an SVP at a 2005 trial and was committed to the state hospital for a two-year term under the version of the statute then in force. The next year, the statute was amended to provide for indefinite commitment instead of renewable two-year terms. In 2007, before Camacho's two-year term ended, the state filed a recommitment petition seeking indefinite commitment under the new version of the statute. Since then, the defense has repeatedly requested or agreed to continuances of the trial date, with the result that the trial on the recommitment petition has yet to occur. Camacho now argues that the extended pretrial delay violates his constitutional rights.

Although the Courts of Appeal have previously addressed similar claims, this case marks the first time this court has considered the constitutional framework for evaluating the timeliness of SVP trials. We now hold that persons facing SVP commitment have a due process right to a timely trial. But as

1

is true in other contexts, whether pretrial delay violates that right depends in the first instance on the reasons for the delay. (*Barker v. Wingo* (1972) 407 U.S. 514, 531.) Here, while the decade-plus delay in holding Camacho's recommitment trial is extraordinarily lengthy, the available record shows that responsibility for the delay lies primarily with the defense, which either sought or agreed to the continuances that led to the delay. While many of the continuance requests were made by Camacho's counsel when Camacho was not personally present in court, the ordinary rule is that delays sought by counsel are attributable to their clients (*Vermont v. Brillon* (2009) 556 U.S. 81, 85), and the record reveals no basis to depart from that rule in this case. Camacho therefore has not established that the pretrial delay in this case resulted in a violation of his due process rights.

Although we find no due process violation in the case before us, we underscore the vital role of trial courts in safeguarding the timely trial right of alleged SVPs. Involuntary commitment entails "a massive curtailment of liberty." (*Humphrey v. Cady* (1972) 405 U.S. 504, 509.) In the context of SVP proceedings, the deprivation of liberty begins when a court finds probable cause to hold an alleged SVP in state custody pending trial. In making determinations that will affect when trial is held, the trial court must take due account of the individual's interests in prompt adjudication and take decisive steps to guard against unjustified delay.

## I.

## A.

The Legislature first enacted the SVP Act in 1995, expressing concerns about "a select group of criminal offenders

who are extremely dangerous as the result of mental impairment, and who are likely to continue committing acts of sexual violence even after they have been punished for such crimes." (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1144 (*Hubbart*).) In its findings and declarations for the SVP Act, the Legislature described its intent to "identify these individuals prior to the expiration of their terms of imprisonment" and, if they are "found to be likely to commit acts of sexually violent criminal behavior beyond a reasonable doubt," to ensure that they "be confined and treated until such time that it can be determined that they no longer present a threat to society." (Stats. 1995, ch. 763, § 1, p. 5921.)

To be committed as an SVP, an individual must meet the SVP Act's definition of the term " '[s]exually violent predator' ": "[A] person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Welf. & Inst. Code, § 6600, subd. (a)(1); see *id.*, subd. (b) [defining " '[s]exually violent offense' " to include certain enumerated crimes "when committed by force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim or another person, or threatening to retaliate in the future against the victim or any other person"].)[1]

The statute sets forth extensive administrative and judicial procedures for determining whether an individual is properly classified as an SVP. The process typically begins

---

[1] The SVP Act has been amended several times since it was first enacted in 1995. Unless otherwise indicated, statutory references are to the version of the SVP Act currently in force.

while the individual is still serving a prison sentence for a sexually violent offense. At least six months before the individual's scheduled release date, the Department of Corrections and Rehabilitation conducts an initial screening of individuals who have committed a qualifying offense, using a standardized screening instrument to review the individual's "social, criminal, and institutional history." (Welf. & Inst. Code, § 6601, subd. (b).) If the initial screening indicates that the person is likely to be an SVP, the individual is referred to the California Department of State Hospitals (Department) for a full evaluation. (*Id.*, subds. (a)(1), (2), (b).) The Department designates two mental health evaluators, who must be practicing psychiatrists or psychologists and must use the Department's standardized assessment protocol. (*Id.*, subds. (c), (d).) If both mental health evaluators agree the person meets the statutory definition of an SVP, then the Director of State Hospitals asks the state to file a petition for commitment. (*Id.*, subd. (d).) If the evaluators reach different conclusions, then two new evaluations are performed by independent mental health professionals. (*Id.*, subd. (e).) A petition for commitment may be filed only if the two new evaluators concur that the person meets the criteria for commitment. (*Id.*, subd. (f).)

Once the Director of State Hospitals has forwarded the evaluators' reports to the appropriate district attorney, the district attorney may file a petition for commitment. (Welf. & Inst. Code, § 6601, subd. (h)(1).) The trial court then reviews the petition to determine whether it "contains sufficient facts that, if true, would constitute probable cause" that the person meets the definition of an SVP. (*Id.*, § 6601.5.) If the court answers that question in the affirmative, the court then must hold a probable cause hearing within 10 days, absent good cause

for extending the time period. (*Id.*, §§ 6601.5, 6602, subd. (b).) In the meantime, the person must be detained in a secure facility. (*Id.*, § 6601.5.) If, after a hearing, the court finds probable cause to believe the individual is an SVP, the person is detained at the state hospital pending trial. (*Id.*, § 6602.5, subd. (a).)

The statute does not specify a fixed deadline by which trial must occur. It does, however, lay out a number of procedural protections for the conduct of trial, including the right to a jury and to the assistance of counsel and relevant experts. (Welf. & Inst. Code, § 6603, subd. (a).) At trial, the state bears the burden of proving beyond a reasonable doubt that the person is an SVP. (*Id.*, § 6604.) Specifically, the state must prove four conditions are met: "(1) the person has previously been convicted of at least one qualifying 'sexually violent offense' listed in [Welfare and Institutions Code] section 6600, subdivision (b) [citation]; (2) the person has 'a diagnosed mental disorder that makes the person a danger to the health and safety of others' [citation]; (3) the mental disorder makes it likely the person will engage in future acts of sexually violent criminal behavior if released from custody [citation]; and (4) those acts will be predatory in nature." (*Walker v. Superior Court* (2021) 12 Cal.5th 177, 190 (*Walker*).) The state must prove these conditions exist at the time of trial: A person is subject to SVP commitment only if the person is found to have a current diagnosed mental disorder and to pose a current risk to public safety. (*Hubbart*, *supra*, 19 Cal.4th at p. 1162.)

If the individual is found at trial to be an SVP, the court then issues an order of commitment. (Welf. & Inst. Code, § 6604; *id.*, § 6604.1, subd. (a).) As initially enacted, the SVP Act provided for renewable two-year commitment terms. (*People v.*

*McKee* (2010) 47 Cal.4th 1172, 1183 (*McKee*), citing former Welf. & Inst. Code, § 6604.)  In 2006, however, voters passed Proposition 83 (Gen. Elec., Nov. 7, 2006), which replaced these renewable two-year terms with an indefinite commitment from which the individual can be released if it is shown that the individual no longer qualifies as an SVP. (See *McKee*, at p. 1184; see also Welf. & Inst. Code, § 6604.1, subd. (a).)  Under this system, a person who is committed as an SVP must be reexamined annually by a qualified mental health professional to determine whether commitment is still appropriate. (Welf. & Inst. Code, § 6604.9, subds. (a), (b), added by Stats. 2013, ch. 182, § 1, p. 2256.)  Depending on the results of the evaluation, the report may recommend unconditional discharge, conditional release with outpatient supervision and treatment in the community, or continued commitment at the state hospital.  The person then may file a petition for release and, depending on the circumstances, may be entitled to a hearing at which the person has a right to appointed counsel and experts.  (Welf. & Inst. Code, § 6605, subd. (a)(3); *id.*, § 6608, subds. (a), (g).)

If the annual report concludes the person is no longer an SVP, the Director of State Hospitals must authorize the committed person to petition for unconditional discharge. (Welf. & Inst. Code, § 6604.9, subd. (d).)  After making an initial probable cause determination on the petition, the court holds a hearing — or, at the individual's request, a jury trial — at which the state bears the burden to prove beyond a reasonable doubt that the individual continues to meet the criteria for commitment as an SVP.  (*Id.*, § 6605, subd. (a)(2), (3).)

A person may petition for conditional release whether or not the annual report recommends that course (Welf. & Inst. Code, § 6608, subd. (a)), but the recommendation determines

how the petition will be handled. If the annual report recommends conditional release, then the state must show by a preponderance of the evidence at a release hearing that the individual is not, in fact, suitable for release. (*Id.*, § 6604.9, subd. (d); see *id.*, § 6608, subd. (k).) If, on the other hand, the annual report recommends continued commitment, the court screens the petition for frivolousness before holding a hearing (*id.*, § 6608, subd. (a)), and at that hearing the individual bears the burden to show by a preponderance of the evidence that conditional release is appropriate. (*Id.*, subd. (k).) After one year on conditional release, the individual may petition for unconditional discharge from SVP commitment. (*Id.*, subd. (m).)

**B.**

In 1993, Ciro Camacho pleaded guilty to one count of continuous sexual abuse of a child in violation of Penal Code section 288.5 and two counts of lewd acts on a child under 14 years old in violation of Penal Code section 288, subdivision (a). He was sentenced to 14 years in prison.

In August 2002, while Camacho was still serving his sentence, the state filed a petition to commit him as an SVP. Two doctors had evaluated Camacho and concluded he met the statutory criteria for SVP commitment. Camacho waived his right to a jury trial, and the trial court held a bench trial in January 2005. The court ordered Camacho committed to the state hospital for a two-year term under the version of the SVP Act then in effect.

The following year, Proposition 83 replaced the system of renewable two-year terms with the current system of indefinite commitments subject to annual reevaluations. (See *McKee*, *supra*, 47 Cal.4th at pp. 1183–1184.) On December 18, 2006,

before Camacho's two-year term expired, the state filed a petition to recommit Camacho to an indefinite term. On February 8, 2007, Camacho waived the probable cause hearing on the recommitment petition. The trial on that petition has yet to occur. Camacho now challenges that delay as violating his due process right to a timely trial.

In the years since 2007, Camacho's case has appeared on the trial court docket and been continued more than 200 times without trial. Although the record of the proceedings is limited, the parties have stipulated to the relevant procedural history and the accuracy of the available record. Because Camacho's due process claim requires careful review of the relevant facts, we discuss this history in some detail below.

After waiving the probable cause hearing on the 2006 petition for recommitment, Camacho entered a general time waiver on March 29, 2007, when he was personally present in court. He was then transported from the county jail to the state hospital.

On July 25, 2008, the Public Defender declared a conflict. The court assigned Attorney William Davis as replacement defense counsel. Davis would serve as Camacho's defense counsel for the next decade, until 2018.

Two updated doctors' reports became available in August 2008, both concluding that Camacho met the criteria for commitment. The court held 16 additional hearings in 2008, but the court did not set a trial date.

In 2009, Camacho's case appeared on the court docket 16 times. Camacho was present for 10 of these hearings. That year, two trial dates were set and later continued, with no record of the reason for these continuances. Camacho appeared in

court for another trial setting conference on March 11, 2010. No trial date was set.

Between March 11, 2010, and July 5, 2018, Camacho's case appeared on the trial court docket 102 times. Camacho was not personally present at any of the hearings held during that eight-year period.

In 2010, doctors again concluded that Camacho met the criteria for commitment as an SVP. The court did not set any additional trial dates in 2010. The minute orders from 2010 generally state "time waived."

In 2011, the court held 15 hearings. On April 14, 2011, the court noted that Davis was "still [a]waiting confirmation of experts" and a general time waiver was in effect. No trial date was set in 2011. From 2012 to 2015, the court regularly called Camacho's case and set hearings, but the record shows no reason for the repeated continuances.

In 2015, four new doctors' reports were prepared. One of these reports concluded — for the first time — that Camacho no longer met the criteria for commitment. The other three reports, by contrast, concluded that Camacho continued to meet the SVP criteria.

Despite this development, 2016 continued in much the same vein as the preceding five years. The court held eight hearings that year without setting a trial date.

In 2017, Camacho's case appeared on the court docket 10 times, again with no trial date set and multiple continuances granted at Davis's request. On March 22, 2018, the court called the case for a regular hearing. According to the reporter's transcript (one of the few available in this case), Davis informed the court Camacho was "at the hospital at Coalinga by his own

choice." The District Attorney and Davis told the court they were mutually requesting a continuance, with Davis explaining "[t]here have been some statewide developments in these kinds of cases that [the prosecutor] and I have looked at."

The court held an in camera hearing on May 17, 2018. Davis waived Camacho's presence for that hearing and the court continued the case to June 21 to allow counsel to secure Camacho's appearance by video conference. Camacho did not appear on June 21, however, and Davis waived his presence "for today's hearing."

On July 5, 2018, the court held another in camera hearing. This time, Camacho was present by video. The prosecutor did not appear. At the hearing, Davis told Camacho that he had "placed calls" to three "psychologists or psychiatrists . . . well qualified to assist us in this case." Camacho responded, "All right." Camacho then asked if he should send Davis letters that staff members at the hospital wanted to write "in [his] behalf." Davis said to "[g]o ahead" and asked if Camacho had his address. Camacho confirmed he did. The court then concluded, "All right. I'll find good cause to continue this to the 16th?" And Davis confirmed, "Yes."

On September 20, 2018, the court held another hearing. Camacho was not present. Davis made "an oral motion to continue the matter" and the prosecutor objected — the first recorded objection to a continuance in the history of the case. The court overruled the objection and scheduled a trial setting conference in October.

The parties met again on October 4, 2018, with Camacho present by video conference. The parties discussed setting a trial date. Davis noted that Camacho "need[ed] to have

additional evaluations" because the last doctors' reports were from 2015. Davis suggested March 5 for a jury trial. The prosecutor noted he had another trial on that date, but stated he was "available several weeks before that. And we are looking forward to moving this case forward to conclusion." Davis then suggested April for trial, and the prosecutor stated, "just for the record, I can do this significantly earlier," and "I'm not trying to delay the trial." Davis said he understood but that because of his preparation, April was best. The court set a trial date for April 2 and ordered monthly pretrial hearings.

After the date was set, the prosecutor said that since Camacho was present, he wanted to "clear up a few things." The prosecutor continued, "First off, the [d]efendant does have a right to a speedy trial in this matter within a reasonable time period. [¶] . . . [¶] . . . However, my understanding is the [d]efendant, having these rights in mind, is consenting to this date in April because he feels it's in his best interests." Davis responded that he had not "had a chance to discuss all of the things that [he] need[ed] to discuss with [Camacho]" and asked the court to order that Camacho be permitted to give Davis a phone call the next week to "go over all the issues necessary." The court asked if Camacho had heard everything and addressed Camacho directly as he summarized that the parties would reconvene two weeks later, so that "Mr. Davis can talk to you in more detail about what he's planning to do regarding your defense. And at that time you can decide if you want to ask for a speedy trial or if you're agreeable to putting it out longer, which is what has happened so far. [¶] But so far you're okay with everything?" Camacho replied, "Yes."

The court called Camacho's case again two weeks later, on October 18, 2018. Davis began the hearing by stating that

Camacho "doesn't want to waive any more time." Davis referred to the Court of Appeal's then-recent decision in *People v. Superior Court (Vasquez)* (2018) 27 Cal.App.5th 36 (*Vasquez*), which upheld the trial court's determination that a 17-year delay in holding an SVP trial violated due process because the delay had been caused by a " ' "breakdown in the public defender system." ' " (*Id.* at p. 41.) The prosecutor responded he would not object to "resetting the trial within 60 days of today."

Camacho reiterated that he wanted "to apply this *Vasquez* case." Davis stated he was "assuming that means he wants another attorney," and Camacho confirmed. Davis noted, "*Vasquez* does create some interesting issues . . . part of the problem is that there is a systemic logistical problem . . . everybody that has one of these petitions pending is held at Coalinga, which is a hundred miles from anywhere. Literally, anywhere else in the state."

Davis stated that "another issue" was that Camacho was "not sure that he wants to be brought to the county jail." The prosecutor again suggested that they set trial within 60 days. The court said it sounded like it was Camacho's "desire to have a speedy trial in the matter" and they could set trial within 60 days and "come back in two weeks for a readiness conference." Davis asked Camacho, "Do you want to be here in Merced County?" Camacho responded, "No. No. [¶] . . . [¶] I want to stay here in Coalinga. [¶] . . . [¶] . . . I mean, how long is the trial going to be? If it's gonna be a while, then, yeah, I'll go to the county [jail]. But if it's just gonna be a ready conference, then send me back." Davis and Camacho ultimately agreed to decide about transportation later and keep the April trial date. The prosecutor then reiterated that since "the defendant is requesting a speedy trial" he had no objection to "advancing

[trial] to December 11th which is within 60 days of today." The court set trial for December 11.

On November 6, 2018, the court held a readiness conference that began with Davis informing the court that Camacho wanted to "go ahead and make an oral motion . . . to dismiss for a lack of prosecution." The court agreed with Davis's recommendation to refer the motion to a different law firm, Fitzgerald, Alvarez & Ciummo, in order "to look into Mr. Camacho's claims pursuant to the *Vasquez* case."

On November 29, 2018, Davis declared a conflict and was relieved by the court. Fitzgerald, Alvarez & Ciummo became Camacho's defense counsel for all purposes.

On March 11, 2021, Camacho filed a motion to dismiss the 2006 petition to extend commitment, claiming his right to due process had been violated "due to the excessive delay in bringing his matter to trial." The trial court denied the motion to dismiss, describing the pretrial delay as "troubling," but finding that "most of that [delay] is attributable to Mr. Camacho or his counsel." Camacho then filed an original petition for a writ of mandate in the Court of Appeal.

The Court of Appeal denied Camacho's writ petition in an unpublished opinion, finding that although " 'substantial delays weigh in [Camacho]'s favor' . . . [¶] . . . [¶] . . . the record shows the delay was at Camacho's request or agreement," such that his right to due process was not violated. The court explained that "[u]p to October 18, 2018, Camacho waived time repeatedly and requested or acquiesced to the numerous continuances, either in person or through his attorney." Although the continuance requests were made by counsel without Camacho present, the court cited the " 'general rule' " that " ' "delays caused by defense

counsel are properly attributed to the defendant, even where counsel is assigned." ' " The court further opined that while the length of Camacho's pretrial incarceration " 'constitutes some degree of prejudice,' " the delay had not prejudiced Camacho's defense, reasoning that "the passage of time improved Camacho's prospects: the first medical evaluation opining that he no longer satisfied [the criteria for commitment] was prepared" in 2015.

## II.

The issue of SVP trial delays is not new. Nearly 20 years ago, courts began to raise concerns that significant pretrial delays in SVP cases "can and do occur." (*Litmon v. Superior Court* (2004) 123 Cal.App.4th 1156, 1170 (*Litmon*); see *Orozco v. Superior Court* (2004) 117 Cal.App.4th 170, 179 (*Orozco*).) At the time, the courts' concern was that delays in holding trials to recommit SVPs sometimes matched or even exceeded the two-year commitment period prescribed by the law then in force. (*Ibid.*) Since the SVP Act was amended to provide for indefinite commitment terms, the issue of pretrial delay has not abated. Extended delays — in some cases upwards of a decade — have not been uncommon.[2]

---

[2] (See, e.g., *In re Kerins* (2023) 89 Cal.App.5th 1084 [14-year delay], review granted June 14, 2023, S279933; *People v. Hubbs* (Jan. 19, 2023, D077636) [nonpub. opn.] 2023 WL 311941 [15-year delay]; *People v. Carter* (2022) 86 Cal.App.5th 739 [14-year delay]; *People v. Lozano* (Aug. 10, 2022, C094245) [nonpub. opn.] 2022 WL 3224388 [11-year delay]; *People v. Ballardo* (Mar. 29, 2022, B290567) [nonpub. opn.] 2022 WL 906421 [13-year delay]; *Camacho v. Superior Court of Merced County* (Jan. 21, 2022, F082798) [nonpub. opn.] 2022 WL 189070 [15-year delay];

The reasons for delay in a given case vary, but certain features of the SVP Act help to explain why, in general, extended pretrial delays may be more likely to occur in SVP cases than in other cases. As an initial matter, SVP trials, unlike criminal trials and most types of civil trials, are not subject to statutory time limits. (See *Litmon*, *supra*, 123 Cal.App.4th at pp. 1170–1171; cf. Pen. Code, § 1382, subd. (a)(2) [setting presumptive 60-day limit for trial in a criminal case]; Code Civ. Proc., § 583.310 [setting presumptive five-year limit for trial in a civil case].) This is not because the Legislature has been inattentive to questions of timing in SVP cases: In 1998, it set a 10-day limit for holding a pretrial probable cause hearing (Welf. & Inst. Code, § 6601.5, as added by Stats. 1998, ch. 19, § 2, p. 145); more recently, it set limits on granting continuances and required that continuance requests be made in writing and supported by good cause. (Welf. & Inst. Code, § 6603, subd. (c),

---

*People v. Eden* (Jan. 21, 2022, A162818) [nonpub. opn.] 2022 WL 188679 [5-year delay]; *People v. Tran* (2021) 62 Cal.App.5th 330 [11-year delay]; *People v. Orey* (2021) 63 Cal.App.5th 529 [8-year delay]; *People v. Sims* (Feb. 24, 2021, C088029) [nonpub. opn.] 2021 WL 717063 [9-year delay]; *People v. Taylor* (Jan. 28, 2021, B303044) [nonpub. opn.] 2021 WL 281796 [9-year delay]; *People v. Allen* (Jan. 27, 2021, B288740) [nonpub. opn.] 2021 WL 268353 [15-year delay]; *In re Butler* (2020) 55 Cal.App.5th 614 [13-year delay]; *People v. DeCasas* (2020) 54 Cal.App.5th 785 [13-year delay]; *People v. Bradley* (2020) 51 Cal.App.5th 32 [3-year delay]; *People v. Teluci* (Nov. 4, 2020, A155206) [nonpub. opn.] 2020 WL 6482396 [11-year delay]; *People v. Raker* (Aug. 20, 2020, B299718) [nonpub. opn.] 2020 WL 4877437 [11-year delay]; *People v. Barrcena* (Aug. 3, 2020, B289917) [nonpub. opn.] 2020 WL 4435548 [11-year delay]; *People v. Burns* (May 21, 2020, B296809) [nonpub. opn.] 2020 WL 2570173 [13-year delay]; *People v. Strahan* (Feb. 5, 2020, B295295) [nonpub. opn.] 2020 WL 563906 [22-year delay].)

as amended by Stats. 2019, ch. 606, § 1.)  But despite various calls to set firm limits on the scheduling of trial, the Legislature has thus far declined to do so, instead choosing to give courts and parties greater flexibility in matters of trial timing.  (See, e.g., *Litmon*, at p. 1172.)

More fundamentally, SVP trials are unlike criminal trials in that they are not aimed primarily at establishing an individual's liability for past events, but instead at establishing the individual's present need for mental health treatment. Although an SVP proceeding may involve inquiry into certain facts about an individual's criminal history (see, e.g., *Walker*, *supra*, 12 Cal.5th at p. 185), the central focus of an SVP trial is whether the individual currently has a mental disorder that poses a danger to the public and thus requires hospitalization (*Hubbart*, *supra*, 19 Cal.4th at p. 1162).  Once a judge has found probable cause to believe an individual is an SVP, that individual is held in a state hospital and begins to receive mental health treatment — even before trial is ever held.  For this reason, both sides may have a common interest in delaying trial.  From the individual's perspective, allowing more time for treatment may ultimately improve the chance of success at trial, insofar as treatment may help address a mental disorder that a jury might otherwise find poses a risk to the public.  (See, e.g., *In re Butler*, *supra*, 55 Cal.App.5th at p. 635 (*Butler*).)  While individuals committed as SVPs after trial may later petition for release, conditions are generally more favorable at the initial trial, where the state always bears the burden of proving beyond a reasonable doubt that the individual qualifies as an SVP. (Welf. & Inst. Code, § 6604; cf. *id*., §§ 6605, 6608 [describing procedures for postcommitment release].)  For the state's part, there are limited incentives to expend the resources necessary

to push the case toward trial when, following a finding of probable cause, the individual is already being hospitalized and receiving treatment.

Understanding why parties may have incentives to delay SVP trials in general does not, of course, tell us the reasons for delay in any particular case. Nor does the Legislature's choice to avoid imposing statutory time limits justify prolonged delay or tell us whether the delay is consistent with an individual's constitutional rights. In recent years, the Courts of Appeal have confronted a number of cases calling for consideration of these questions. (See, e.g., *In re Kerins*, *supra*, 89 Cal.App.5th 1084 [14-year pretrial delay and extended absence from court did not violate due process], review granted; *People v. Tran*, *supra*, 62 Cal.App.5th 330 [11-year delay between petition for commitment and SVP retrial did not violate due process]; *People v. Landau* (2013) 214 Cal.App.4th 1, 9 (*Landau*) [seven-year delay did not violate due process].) In three cases, courts found that extended delays violated the due process rights of alleged SVPs.

In the first of these cases, *Vasquez*, *supra*, 27 Cal.App.5th 36, the Court of Appeal reviewed the record of the 17-year delay in that case and affirmed the superior court's finding that delays sought by defense counsel could not be attributed to Vasquez himself, but instead resulted from an institutional breakdown related to budget cuts and understaffing in the public defender's office that handled his case. (*Id.* at pp. 54, 66, citing *Vermont v. Brillon*, *supra*, 556 U.S. at p. 94 (*Brillon*).) Concluding the delay violated Vasquez's due process right to a timely SVP trial, the court dismissed the petition for commitment.

Two years later, the appellate court in *People v. DeCasas*, *supra*, 54 Cal.App.5th 785 (*DeCasas*) confronted a 13-year delay caused by "the same reduction of the SVP unit staff" at the same public defender's office as in *Vasquez*. (*DeCasas*, at p. 809.) Following the logic of *Vasquez*, the court found a due process violation and dismissed the petition for commitment. (*Id.* at p. 813.)

Finally, the court in *Butler, supra*, 55 Cal.App.5th 614 dismissed a petition for commitment after finding a due process violation based on pretrial delay. Though there were "several factors . . . suggesting that the public defender's mismanagement of this case went beyond any particular attorney's performance," the court found that even if those circumstances did not constitute systemic breakdown in the public defender's office, it would be "fundamentally unfair to hold Butler personally and solely accountable for delays caused by his counsel" where the record showed that counsel refused to convey Butler's explicit demands for trial, failed to demand a probable cause hearing or consult with a defense expert, and did not ever "come close to being ready for trial." (*Id.* at p. 658.)

In response to *Vasquez* and cases that followed, the Legislature amended the SVP Act to prescribe more demanding requirements for seeking and granting trial continuances. The statute now requires that motions for trial continuances be in writing, supported by good cause, and resolved in a timely manner. (Welf. & Inst. Code, § 6603, subd. (c), as amended by Stats. 2019, ch. 606, § 1.) While these amendments provide procedural safeguards against unwarranted delays, they do not address whether or when an SVP commitment trial may become untimely as a result of previously granted continuances.

18

## III.

We turn, then, to the question before us, which concerns the constitutional principles governing the timeliness of SVP trials. The due process clauses of both the federal and state Constitutions forbid the state from depriving individuals of their liberty without due process of law. (U.S. Const., Amend. XIV, § 1; Cal. Const., art. I, § 7, subd. (a).)[3] Civil commitment under the SVP Act undoubtedly involves "a significant deprivation of liberty." (*People v. Otto* (2001) 26 Cal.4th 200, 209; see *Kansas v. Hendricks* (1997) 521 U.S. 346, 356–357.) "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " (*Mathews v. Eldridge* (1976) 424 U.S. 319, 333 (*Mathews*).) Thus, as every Court of Appeal to address the issue has agreed, individuals facing commitment under the SVP Act have a due process right to a timely trial. (See, e.g., *Orozco, supra*, 117 Cal.App.4th at pp. 179–180; *People v. Litmon* (2008) 162 Cal.App.4th 383, 395–399 (*Litmon II*); *Landau, supra*, 214 Cal.App.4th at p. 27; *Butler, supra*, 55 Cal.App.5th at p. 637.)

Although the appellate courts have agreed on this threshold point, they have expressed uncertainty about the appropriate framework for evaluating claims of excessive pretrial delay under the due process clause. (See, e.g., *Litmon*

---

[3] Although Camacho brings a claim under both the federal and state Constitutions, he focuses exclusively on federal authorities. While we reaffirm that we have the "power and authority to construe the state Constitution independently" (*Hubbart, supra*, 19 Cal.4th at p. 1152, fn. 19), Camacho has offered no arguments specific to the California Constitution. Our analysis, like the parties', therefore centers on the federal Constitution.

*II*, *supra*, 162 Cal.App.4th at p. 399 [noting the United States Supreme Court has not addressed the issue].)  In the absence of more specific guidance, the Courts of Appeal have uniformly borrowed the *Barker* framework used to adjudicate claims of speedy trial violations in criminal cases.  (*Barker v. Wingo*, *supra*, 407 U.S. 514 (*Barker*); *People v. Williams* (2013) 58 Cal.4th 197 (*Williams*).)  But several courts, including the Court of Appeal in this case, have also applied the *Mathews* general balancing test used to evaluate the adequacy of governmental process under the federal due process clause.  (*Mathews*, *supra*, 424 U.S. 319.)  We now clarify that this general balancing under *Mathews* is unnecessary; it suffices to consider the factors laid out in *Barker* in deciding whether an alleged SVP has been deprived of the constitutional right to a timely trial.

In *Barker*, the United States Supreme Court considered the scope of the right to a speedy criminal trial secured by the Sixth Amendment to the federal Constitution.  The speedy trial right, the court observed, is a "slippery" one, "generically different from any of the other rights enshrined in the Constitution for the protection of the accused."  (*Barker*, *supra*, 407 U.S. at pp. 522, 519.)  For one thing, the accused may not actually want a speedy trial and may perceive a tactical advantage in delay; in particular, the accused may believe that the passage of time will hurt the prosecution's ability to prove guilt more than it hurts the accused's ability to defend.  (*Id.* at pp. 519–521.)  In this respect, the interests of the accused may not align with broader societal interests in the prompt resolution of criminal charges.  (*Id.* at p. 519; see *id.* at pp. 519–521.)  And "perhaps most importantly," the court explained, "the right to speedy trial is a more vague concept than other procedural rights."  (*Id.* at p. 521.)  "We cannot definitely say

20

how long is too long in a system where justice is supposed to be swift but deliberate. As a consequence, there is no fixed point in the criminal process when the State can put the defendant to the choice of either exercising or waiving the right to a speedy trial. . . . [A]ny inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case." (*Id.* at pp. 521–522, fn. omitted.)

In keeping with these observations about the slippery nature of the speedy trial right, the *Barker* court declined to adopt any bright-line rules for determining when the right has been violated. The court instead identified four factors for courts to examine: the length of the pretrial delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant caused by the delay. (*Barker*, *supra*, 407 U.S. at p. 530.) The defendant carries the "burden of demonstrating a speedy trial violation under *Barker*'s multifactor test." (*Williams*, *supra*, 58 Cal.4th at p. 233.) Because none of these factors is dispositive, "courts must still engage in a difficult and sensitive balancing process" to determine whether trial has been unconstitutionally delayed. (*Barker*, at p. 533.)

Although *Barker* concerned the constitutional right to a speedy trial in a criminal case, courts have employed *Barker*'s flexible, four-factor inquiry to evaluate claims of unconstitutional delay in other contexts. (See, e.g., *United States v. $8,850* (1983) 461 U.S. 555, 564 [applying *Barker* test to evaluate pretrial delay in civil forfeiture case]; *DeLancy v. Caldwell* (10th Cir. 1984) 741 F.2d 1246, 1247–1248 (per curiam) [applying *Barker* factors to review delay in furnishing trial transcript to be used by incarcerated criminal defendant on appeal]; see also *U.S. v. Sanders* (6th Cir. 2006) 452 F.3d 572,

577 [holding that *Barker* applies to due process claims based on postsentencing delays, and citing similar cases from other circuits]; cf. *Betterman v. Montana* (2016) 578 U.S. 437, 448, fn. 12 (*Betterman*) [reserving the question of how the due process clause applies to claims based on postsentencing delays, but noting that "[r]elevant considerations may include the length of and reasons for delay, the defendant's diligence in requesting expeditious sentencing, and prejudice"].)

The *Barker* factors are likewise appropriate for use in evaluating due process claims based on delays in holding SVP trials. The timing of SVP trials is not in all respects comparable to the timing of criminal trials, but many of the same general principles translate. Once a court has found probable cause to support an SVP commitment petition, an individual is committed to a state hospital for treatment while awaiting trial. But as is true in criminal cases, an individual's interests in a timely trial do not run in just one direction; one individual facing SVP commitment may wish for a prompt trial, while another may perceive a tactical advantage in delay. (See *Barker*, *supra*, 407 U.S. at pp. 519–521.) And, more fundamentally, as is true in criminal cases, it is impossible to define with any precision a fixed point at which trial must occur — "how long is too long in a system where justice is supposed to be swift but deliberate." (*Id.* at p. 521.) The *Barker* test outlines a broadly relevant set of functional, case-dependent factors to consider in analyzing questions of trial timing. To the extent the SVP context differs from the criminal context in which *Barker* was decided, the flexibility of the test allows courts to account for those differences.

Indeed, every Court of Appeal to address the issue to date has done so by employing the *Barker* factors.[4] But in an abundance of caution, some have also employed the *Mathews* test to evaluate claims of SVP trial delay.

The issue in *Mathews* was whether due process required an evidentiary hearing before the termination of Social Security disability payments. (*Mathews*, *supra*, 424 U.S. at p. 323.) The United States Supreme Court set out a three-factor framework to decide the question: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Id.* at p. 335.) With its focus on evaluating the value of additional procedural safeguards for the sake of reducing error, this test is more clearly suited to questions about the adequacy

---

[4] So have other state high courts. (See *Matter of Ellison* (2016) 305 Kan. 519, 531–532, 535 [adopting *Barker* test to evaluate delay of 1,705 days between probable cause hearing and trial under Kansas's SVP Act]; *Morel v. Wilkins* (Fla. 2012) 84 So.3d 226, 246 [applying *Barker* to evaluate 10-year pretrial delay under Florida's SVP Act]; cf. *In re Commitment of Beyer* (2006) 287 Wis.2d 1, 25–31 [implicitly adopting *Barker* in evaluating due process violation for 22-month delay between filing of annual examination and probable cause hearing]; *Com. v. Blake* (2009) 454 Mass. 267, 279–280 (conc. opn. of Ireland, J.) [discussing relevance of *Barker* to evaluation of 13-month delay between bench trial for adjudication of sexual dangerousness and issuance of decision].)

of procedures used in government decisionmaking than to questions about the timing of those decisions.

To be sure, the United States Supreme Court has invoked *Mathews* in evaluating certain timing-related claims. In *FDIC v. Mallen* (1988) 486 U.S. 230, 231–232, 242, for instance, the high court employed a modified version of the *Mathews* test in considering, and rejecting, a claim that a statute allowing the government to suspend indicted bank officials facially violated due process because the statute did not guarantee that suspended officials would receive sufficiently prompt decisions on their appeals. (See *Litmon II*, *supra*, 162 Cal.App.4th at pp. 396–397 [discussing *Mallen*].)

But the trial timing question here bears far greater resemblance to the trial timing question in *Barker* than to the question in *Mallen* about the adequacy of postsuspension review procedures. And it serves no meaningful purpose to analyze pretrial delays under both *Mathews* and *Barker*, as some Courts of Appeal have done. None of these courts has ever found that the *Mathews* inquiry yields a different result from *Barker*. This is unsurprising, since the questions the courts have asked under *Mathews* — adapting the three-part test for the context of a challenge to trial timing — are all matters already addressed, with somewhat greater specificity, by the *Barker* factors. We thus clarify that courts need not apply *Mathews* in this context; it suffices to apply the *Barker* factors in considering whether

pretrial delay in an SVP case has resulted in a denial of due process.[5]

---

[5] It is a separate question whether *Barker* dictates the remedy when a violation is found. In the criminal context, *Barker* instructs that the sole remedy for a Sixth Amendment speedy trial violation is dismissal of the prosecution — an "unsatisfactorily severe remedy," but, in the high court's view, the "only possible" one. (*Barker*, *supra*, 407 U.S. at p. 522; accord, *Williams*, *supra*, 58 Cal.4th at p. 233.) The Courts of Appeal have generally assumed the same must be true in evaluating claims of due process violations in the SVP context. (*Vasquez*, *supra*, 27 Cal.App.5th at pp. 82–83 [holding that dismissal is the only possible remedy for a timely trial violation and affirming the trial court's order of dismissal]; *DeCasas*, *supra*, 54 Cal.App.5th at p. 813 [same]; see also *Butler*, *supra*, 55 Cal.App.5th at pp. 637, 664 [affirming order of dismissal without discussing the question of appropriate remedies].)

Other courts have, however, suggested that there may be other possible remedies for unreasonable delays in this context. (*U.S. v. Timms* (4th Cir. 2012) 664 F.3d 436, 455, fn. 19 ["[E]ven if Timms' case constituted a due process violation, the proper remedy would not be release, but to conduct the hearing and adjudicate whether he is a 'sexually dangerous person' under the statute."]; see *Orozco*, *supra*, 117 Cal.App.4th at p. 179 [finding no due process violation, but noting that when trial had not occurred within a reasonable time after the probable cause hearing, the remedy was to order that trial be held "forthwith"]; cf. *Betterman*, *supra*, 578 U.S. at pp. 445, 444 [discussing remedy for unconstitutional postconviction delay in sentencing and noting that "a dismissal remedy ordinarily would not be in order" and would provide "an unjustified windfall" to the defendant].) The parties before us have not addressed the question of possible alternative remedies in this case and we have no occasion to decide it.

## IV.

With this background in mind, we turn to Camacho's due process claim. The Court of Appeal in this case reviewed the trial court's denial of relief for abuse of discretion. Under that standard, "[t]he trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted.) Neither party here contends we should employ a different standard of review. Ultimately, however, the standard of review is not dispositive, because Camacho fails to establish a due process violation under any possible standard.

### A.

We begin with the first *Barker* factor, the length of the pretrial delay. This factor operates as a threshold hurdle; "[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." (*Barker*, *supra*, 407 U.S. at p. 530.) "If the accused makes this showing, the court must then consider . . . the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." (*Doggett v. United States* (1992) 505 U.S. 647, 652 (*Doggett*).)

Here, Camacho awaits trial on a petition for recommitment that was filed in 2006. Although this delay is not entirely out of line with delays seen in other SVP cases, it is an exceedingly lengthy delay all the same. The Attorney General contends that our inquiry should focus more narrowly on the eight-year period from 2010 to 2018, when Camacho did not personally appear in court. The Attorney General notes that

Camacho "makes no real effort to establish that he was denied his speedy trial right between 2006 and 2010," when Camacho frequently appeared personally in court and had entered a general time waiver. The Attorney General concedes, however, that an eight-year delay is "significant" in its own right, and so "the length of the delay weighs in Camacho's favor." We agree; the first *Barker* factor unquestionably supports Camacho's claim of a constitutional timely trial violation.

## B.

We next turn to the second *Barker* factor, the reasons for the delay. This is the "flag all litigants seek to capture" (*United States v. Loud Hawk* (1986) 474 U.S. 302, 315) because the permissibility of pretrial delay depends to a great extent on who bears responsibility for it and why.

In analyzing the second factor, courts examine "whether the government or the criminal defendant is more to blame for th[e] delay." (*Doggett*, *supra*, 505 U.S. at p. 651; *Barker*, *supra*, 407 U.S. at p. 530.) Courts also examine why the delay occurred, for "different weights should be assigned to different reasons." (*Barker*, at p. 531.) If the government deliberately delays trial to hamper the defense, for instance, that effort at manipulation "should be weighted heavily against the government." (*Ibid.*) "A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." (*Ibid.*) By contrast, "if delay is attributable to the defendant, then his waiver [of his right to a speedy trial] may be given effect under

standard waiver doctrine." (*Id.* at p. 529; accord, *Brillon, supra,* 556 U.S. at p. 90.)

Our analysis of the reasons for delay in this case is hampered to some extent by the limited record before us. We emphasize that trial courts have a responsibility to maintain an adequate record for review. The parties have, however, stipulated to an undisputed record that forms a sufficient basis for our opinion today. In the majority of the hearings at which delays were sought and granted, the record does not identify the party that requested the continuance. But in every instance where the available record identifies the party moving for a continuance, the record shows that it was defense counsel — either alone, or jointly with the People. The record also does not show a single instance of the defense objecting to a continuance. In other words, as far as the record shows, virtually all the delays in this case were either sought by the defense or agreed to by the defense, and no continuances were requested solely by the People. Camacho does not contend otherwise. Against that backdrop, we assess the conduct of the defense, the prosecution, and the trial court in turn.

## 1.

It is undisputed that Camacho — either personally or through counsel — either sought or agreed to most of the delay in this case. The central point of dispute between the parties is whether we should distinguish between those delays Camacho personally agreed to and those to which his counsel assented on his behalf, particularly during the eight-year period when Camacho did not personally appear in court.

In general, delays sought by the defendant's counsel weigh against the defendant's claim of a speedy trial violation.

(*Brillon*, *supra*, 556 U.S. at pp. 90–91.) This rule flows from the ordinary principle that an " 'attorney is the [defendant's] agent when acting, or failing to act, in furtherance of the litigation,' " such that the client must assume the consequences of the attorney's delay. (*Ibid.*, quoting *Coleman v. Thompson* (1991) 501 U.S. 722, 753 (*Coleman*).)

Applying this principle in *Brillon*, *supra*, 556 U.S. 81, the United States Supreme Court reversed a state court's decision that pretrial delay should be charged against the state when the blame for the delay lay with court-appointed counsel for an indigent criminal defendant. (*Id.* at p. 92.) The high court explained that "assigned counsel generally are not state actors for purposes of a speedy-trial claim. . . . [¶] . . . Their 'inability or unwillingness . . . to move the case forward,' [citation], may not be attributed to the State simply because they are assigned counsel." (*Id.* at pp. 92–93, fn. omitted.) The court noted that the analysis might be different if, as Brillon had argued, the delay was shown to result from "a systemic 'breakdown in the public defender system.' " (*Id.* at p. 94.) But, the court observed, the Vermont Supreme Court had "made no determination, and nothing in the record suggest[ed], that institutional problems caused any part of the delay in Brillon's case." (*Ibid.*)

In Camacho's case, the Court of Appeal concluded that "the record contains substantial evidence that the delay was 'the result of defense counsel's agreement or . . . explicit request.' " The court cited *Brillon*'s holding that delays caused by defense counsel are ordinarily charged to the defendant. The court acknowledged the high court's suggestion that delay caused by appointed counsel could be charged to the state if there was a systemic breakdown in the public defender system, citing *Vasquez*, *supra*, 27 Cal.App.5th 36 and *DeCasas*, *supra*, 54

Cal.App.5th 785. But the court noted that in Camacho's case "the record does not support such a finding."

Camacho argues the Court of Appeal mistakenly construed *Brillon* to mean that delay caused by defense counsel may be charged against the state *only* when there is a systemic breakdown of the public defender system and under no other circumstances. It is unclear whether the appellate court so held or was simply responding to what it understood as Camacho's argument that there had been an "institutional breakdown." In any event, like Camacho, we do not read *Brillon* as standing for any such broad proposition; *Brillon* addressed a hypothetical systemic breakdown of the public defender system because that was the argument presented in the case. The Attorney General, for his part, acknowledges that a constitutional problem might arise if Camacho had shown "that, during the eight years at issue, his absence from the courtroom had been unknowing or involuntary, or if Camacho had demonstrated that his attorney had waived time against Camacho's wishes." In those circumstances, "the People would likely agree that Camacho suffered a due process violation." (Cf. *Butler*, *supra*, 55 Cal.App.5th at p. 658 [finding due process violation where alleged SVP explicitly demanded trial and defense counsel failed to convey those demands to the court or make progress towards trial].) We, too, agree that *Brillon* does not prevent a court from taking such matters into account.

Still, Camacho provides no sufficient reason for us to depart from the ordinary rule that delays sought by counsel are attributed to their client. (*Brillon, supra*, 556 U.S. at p. 90.) Camacho does not allege that his eight-year absence from court was involuntary. Nor does he allege that his attorney waived time against his express wishes. His argument is, instead, that

30

delays sought by defense counsel during a period when he did not personally appear in court should not count against him, solely by virtue of his absence. We reject this broad argument. (See *People v. Blacksher* (2011) 52 Cal.4th 769, 799 [finding the defendant's absence from 17 pretrial proceedings did not violate constitutional right to be present and noting that most of the proceedings "concerned routine legal and procedural matters"].)

There is no reason why, standing alone, absence from court would relieve an individual of responsibility for delays sought by counsel who was acting as the individual's agent. (*Coleman*, *supra*, 501 U.S. at p. 753.) Of course, an individual's extended absence from court may raise concerns about whether the individual's wishes about timing have been adequately considered; when an individual is absent from court, it becomes more difficult to evaluate whether the individual has been adequately informed about and agrees with counsel's proposed approach to trial timing. Here, however, the record contains no indication that Camacho was inadequately informed of — much less disagreed with — counsel's approach to trial timing during his eight-year absence from court.

Although Davis at one point referenced Camacho's remote location as an obstacle to trial preparation, there is nothing in the record to indicate Davis and Camacho faced substantial obstacles in communicating in general.[6] The continuances and

---

[6] The transcript of the hearing from October 18, 2018 reflects one relevant exchange between Camacho and Davis. Davis stated, "The *Vasquez* case has raised some issues that are certainly parallel to Mr. Camacho's situation." The prosecutor responded that he would not object to "resetting the trial within 60 days of today." Davis reminded the judge that Camacho did

time waivers during the period when Camacho was absent from court were consistent with continuances and waivers that had been entered before 2010, when Camacho did regularly appear in court. And Camacho's first reappearance in court after eight years was uneventful. On that date, Camacho did not assert his timely trial rights, complain about his absence from court, or otherwise express dissatisfaction with the progress of his case. He also confirmed that he had Davis's mailing address, which, if nothing else, suggests he had an available method of communicating with Davis about any concerns he may have had.

In sum, we agree with Camacho that an extended absence from court could raise concerns about an SVP's opportunity to complain about attorney-sought delay, but we conclude that absence alone does not provide a sufficient basis to depart from the ordinary rule that delays sought by attorneys are properly attributed to the clients they represent. On the available record, Camacho bears most of the responsibility for the delay he now challenges.

---

not have any updated evaluations, and Camacho added, "[a]nd this is why I wanted to not waive any more time because they have never come to see me at any time after nine years. [¶] . . . [¶] I've been waiting and waiting for, you know, for somebody to come and talk to me about anything. [¶] And I was looking at this *Vasquez* case, and it kind of like — it does apply to myself. [¶] Seventeen years of not having a representative to get me ready for trial."

We note, however, that Camacho does not assert here that he was unable to speak with Davis or an expert for nine years, or that he was unrepresented for 17 years. Both claims are, moreover, unsupported by the record the parties stipulated to here.

**2.**

While the People were not primarily responsible for the delay in the case, the record also shows the People made little effort to move the case toward trial. The Attorney General acknowledges as much, explaining that "[a]t least until the September 2018 decision in *Vasquez*, the People were amenable in many cases — including Camacho's — to the defendant's desire to delay trial for the purpose of progressing in treatment. If, before the case went to trial, the individual progressed in treatment to the point where he was no longer a danger to public safety, the People could simply dismiss the case."

Although this policy of acquiescence is perhaps understandable, it also carries important risks and drawbacks. For one thing, it invites reliance on the assumption that when the defense repeatedly requests continuances, it is because the alleged SVP has decided to indefinitely delay trial for the purpose of progressing in treatment. Though this may be true of some alleged SVPs, it may not be true of other individuals, and individual preferences may change over time. (See, e.g., *Butler*, *supra*, 55 Cal.App.5th at pp. 635, 636 [noting alleged SVP "made sincere and repeated demands for a speedy trial . . . throughout his 12-year period of detention awaiting trial" and his "public defenders essentially ignored and disregarded his demands for a timely trial" by never communicating those demands in court].) For another, permitting the alleged SVP to indefinitely delay trial discounts the broader societal interest in timely, definitive decisions about whether individuals satisfy the criteria for involuntary commitment — where commitment necessarily comes at taxpayer expense and carries personal costs for families and communities from whom the individual will remain indefinitely separated.

Because alleged SVPs have no duty to bring themselves to trial, the government has a responsibility to ensure the case is moving forward in a manner that is consistent with due process. When faced with unwarranted delays or repeated continuances, "diligent prosecution of an SVP petition may necessitate objecting to the delays, insisting upon trial deadlines, and making the trial court aware of the length of time since the filing of the SVP petition or other pertinent details from the record." (*Butler*, *supra*, 55 Cal.App.5th at p. 655.)

In this case, the Court of Appeal observed that "[n]othing in the record suggests that the prosecution engaged in deliberate delay tactics or acted in bad faith." We agree with the court's conclusion in this regard, and Camacho does not dispute that reading of the record. He argues, however, that the Court of Appeal erred in implicitly requiring a showing of bad faith to prevail on a timely trial claim. To the extent that the Court of Appeal's opinion may be construed as applying such a rule, we agree with Camacho that bad faith on the part of the prosecution is not necessary to establish a constitutional violation. As the United States Supreme Court recognized in *Doggett*, "Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground. While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable." (*Doggett*, *supra*, 505 U.S. at pp. 656–657.)

Ultimately, though the People should have exhibited greater diligence in ensuring Camacho was timely brought to trial, the record shows that the People do not bear most of the responsibility for the delays; as discussed above, the responsibility falls primarily with the defense.

34

**3.**

We now assess the trial court's responsibility for the delay. In the criminal context, this court has recognized that the trial court " 'has an affirmative constitutional obligation to bring the defendant to trial in a timely manner. [Citation.] And to that end, it is entirely appropriate for the court to set deadlines and to hold the parties strictly to those deadlines unless a continuance is justified by a concrete showing of good cause for the delay. [Citation.] The trial judge is the captain of the ship; and it goes without saying that the ship will go in circles if the crew is running around the deck with no firm marching orders.' " (*Williams*, *supra*, 58 Cal.4th at p. 251, quoting *State v. Couture* (2010) 357 Mont. 398, 427.)

Camacho's case did indeed go in circles, and the trial court appears to bear some responsibility. From the limited available record, it appears the trial court allowed long periods of time to elapse without setting a trial date at all; if the trial court made efforts to move the case along, they are not apparent.

The Attorney General argues that the trial court's conduct is "more properly characterized as acceding in Camacho's desire to delay trial rather than as negligence." But what we have said of the People is equally true of the trial court: There are risks and drawbacks to a policy of readily acceding to an alleged SVP's perceived wishes to delay trial. Because trial courts ultimately control when trial will be held, they bear particular responsibility for preserving an alleged SVP's constitutional right to a timely trial.

Trial courts have a number of tools available to fulfill their responsibility to advance a case to trial in a timely manner. Courts should make affirmative inquiries about the procedural

posture of a case and the status of counsel's trial preparation; ask alleged SVPs about their wishes for the timing of trial (or, if the alleged SVP is not present, ask counsel whether there is ongoing communication with the alleged SVP about their wishes regarding trial timing); set a date for trial within a reasonable time from the probable cause hearing; and carefully examine the propriety of continuing that date once it has been set. As in the criminal context, it is " 'entirely appropriate for the court to set deadlines and to hold the parties strictly to those deadlines.' " (*Williams*, *supra*, 58 Cal.4th at p. 251.)

Indeed, the recent amendments to the SVP Act now require the court to proceed with a trial date, once set, unless a continuance is justified by good cause. (Welf. & Inst. Code, § 6603, subd. (c).) To show good cause, the parties must provide written materials that detail "specific facts showing that a continuance is necessary." (*Ibid.*) What constitutes good cause will vary from case to case, but a party's showing of good cause should generally demonstrate due diligence in preparing for trial. Any continuance shall last "only for the period of time shown to be necessary" by the specific factual circumstances justifying the continuance. (*Id.*, subd. (c)(7).) Even when an alleged SVP has entered a time waiver, courts should remind the parties that a trial cannot be delayed indefinitely and must still be held within a reasonable timeframe.

Trial courts also bear the critical duty of creating an adequate record to enable review of any claims that trial has been unconstitutionally delayed. The limitations in the record of this case make our review challenging; such record deficiencies are to be avoided in future cases, and should be helped through careful adherence to the requirements of written

36

justification under Welfare and Institutions Code section 6603, subdivision (c).[7]

Limited though the record may be in this case, however, both parties have stipulated to a joint version of events and the available record supplies a sufficient basis for our decision today. On this record, while the court certainly could have done more to urge the case to trial and enforce deadlines, the responsibility for the delay rests primarily with the defense. The second *Barker* factor thus weighs against finding a violation of his constitutional right to a timely trial.

## C.

Analysis of the third *Barker* factor, the petitioner's assertion of his right to a timely trial, does not hinge on " 'the number of times the accused acquiesced or objected; rather, the focus is on the surrounding circumstances, such as the timeliness, persistence, and sincerity of the objections, the reasons for the acquiescence, whether the accused was represented by counsel, the accused's pretrial conduct (as that conduct bears on the speedy trial right), and so forth. [Citation.] The totality of the accused's responses to the delay is indicative of whether he or she actually wanted a speedy trial.' " (*Williams*, *supra*, 58 Cal.4th at p. 238, quoting *State v. Couture*, *supra*, 357 Mont. at p. 417.) Viewing the complete picture matters because "[t]he more serious the deprivation [of the right

---

[7] We additionally note that, as is typically true, a more complete record of proceedings may be developed by way of a petition for writ of habeas corpus. In this case, Camacho has had the opportunity to present evidence that Davis acted against his wishes in requesting trial continuances and entering time waivers on his behalf. He has not, however, presented any such evidence.

to a speedy trial], the more likely a defendant is to complain." (*Barker*, *supra*, 407 U.S. at p. 531.)

It bears some emphasis that assertion of the right is only one factor in the analysis, and not a dispositive one; in *Barker*, the court explicitly rejected the argument that a defendant must expressly demand a speedy trial or else be deemed to have waived the right. (*Barker*, *supra*, 407 U.S. at p. 528.) Instead, the court instructed that "the defendant's assertion of or failure to assert his right to a speedy trial" is just one factor to balance against the others and must be evaluated in a holistic manner. (*Ibid*.) This flexibility allows courts "to attach a different weight to a situation in which the defendant knowingly fails to object from a situation in which his attorney acquiesces in long delay without adequately informing his client, or from a situation in which no counsel is appointed." (*Id*. at p. 529.) The high court emphasized, however, that "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." (*Id*. at p. 532.)

According to the available record, Camacho first demanded trial in October 2018. Camacho did not demand trial at any point over the previous decade, including in July 2018, when he made his first court appearance in eight years. There is no evidence that he previously asked Davis to go to trial and was ignored; nor does he allege an inability to communicate with Davis during his eight-year absence from court. Camacho was free to offer evidence that defense counsel acted against his wishes in delaying trial when he filed his motion to dismiss, but he did not do so. In sum, there is no evidence that Camacho sought to go to trial before October 2018 and was prevented from exercising his right to do so. On this record, we are not persuaded that Camacho desired trial before October 2018 and

we conclude this *Barker* factor weighs against his claim of a due process violation.

## D.

The final *Barker* factor is the prejudice to the defendant caused by the delay in bringing the case to trial. "Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." (*Barker*, *supra*, 407 U.S. at p. 532.) In the criminal context, the court has identified "three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." (*Ibid.*) In the SVP context, we consider the same interests, but acknowledge differences in how the interests arise.

We begin with the "most serious" interest: the "possibility that the defense will be impaired." (*Barker*, *supra*, 407 U.S. at p. 532.) The *Barker* court identified this as the most important interest covered by the Sixth Amendment speedy trial right, since impairment to an individual's ability to present a defense "skews the fairness of the entire system." (*Barker*, at p. 532.) Of course, not every case raises such concerns; indeed, a criminal defendant may affirmatively deploy delay as a "defense tactic." (*Id.* at p. 521.) "[U]nlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not *per se* prejudice the accused's ability to defend himself." (*Ibid.*) But in many criminal cases, a period of lengthy pretrial delay may impose real detriment to an individual's ability to mount a defense; defense witnesses may die, disappear, or lose their memory of the relevant events. (*Id.* at p. 532.) Because "time's erosion of exculpatory evidence

and testimony 'can rarely be shown' . . . we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." (*Doggett*, *supra*, 505 U.S. at p. 655, quoting *Barker*, at p. 532.) Accordingly, in the criminal context, " '[a]ffirmative proof of particularized prejudice is not essential to every speedy trial claim' . . . '[w]hile such presumptive prejudice cannot alone carry a Sixth Amendment claim . . . it is part of the mix of relevant facts, and its importance increases with the length of delay.' " (*People v. Horning* (2004) 34 Cal.4th 871, 892, quoting *Doggett*, at pp. 655–656.)

There is little reason, however, to apply a presumption of trial prejudice in the SVP context. As previously noted, trial on a petition for commitment under the SVP Act aims to establish whether a person meets the definition of an SVP *at the time of trial*. This inquiry is categorically different from that of a criminal trial, where the issue is whether the defendant's past conduct constitutes guilt of a particular offense. In the SVP context, then, time ordinarily will not erase critical evidence for the defense, since the jury relies on recent expert evaluations to evaluate whether the individual qualifies as an SVP at the time of trial. In Camacho's case, for example, though his defense may suffer if the author of the favorable 2015 report recommending release became unavailable to testify, that evidence is unlikely to be dispositive. Camacho will still need updated evaluations by mental health experts before he can proceed to trial. Mental status may fluctuate over time, and the jury will focus on the most recent evidence to determine whether the alleged SVP meets the commitment criteria at the time of trial. Severe prejudice to the alleged SVP's defense is less likely to result

purely as a function of the passage of time; as a result, no presumption of prejudice applies in this context.[8]

In addition to prejudice at trial, the *Barker* court identified "oppressive pretrial incarceration" and the "anxiety and concern of the accused" as two other threats the speedy trial right was designed to ward against. (*Barker*, *supra*, 407 U.S. at p. 532.) The court observed that "time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs." (*Ibid.*)

Being held in anticipation of an SVP trial, like pretrial detention in a jail, unquestionably entails a severe and oppressive restriction on liberty that may give rise to feelings of anxiety and concern. (*Addington v. Texas* (1979) 441 U.S. 418, 425–426 [noting it is "indisputable that involuntary commitment to a mental hospital . . . can engender adverse social consequences to the individual"].) But pretrial SVP custody does differ from pretrial criminal detention in certain pertinent respects. After the trial court holds a probable cause hearing, alleged SVPs are confined at a state hospital, not jail, and begin receiving mental health treatment while they await trial. (Welf. & Inst. Code, § 6600.05, subd. (a); *id.*, §§ 6602, subd. (a), 6604.) Pretrial treatment of the underlying mental disorder

---

[8] We disapprove the following cases to the extent they apply a presumption of prejudice when evaluating a claimed violation of the due process right to a timely SVP trial: *People v. Tran*, *supra*, 62 Cal.App.5th at p. 354; *In re Butler*, *supra*, 55 Cal.App.5th at p. 662; *People v. Bradley*, *supra*, 51 Cal.App.5th at p. 41; *People v. DeCasas*, *supra*, 54 Cal.App.5th at p. 808; *People v. Superior Court (Vasquez)*, *supra*, 27 Cal.App.5th at p. 74.

that caused the state to seek commitment in the first place may ultimately facilitate the individual's release before trial. This observation does not, of course, minimize the oppressive nature of involuntary detention awaiting an SVP trial. But it does to some extent distinguish pretrial incarceration at a state hospital from pretrial detention at a jail, which has few rehabilitative resources.

Determining how heavily to weigh the prejudice resulting from pretrial custody therefore requires a sensitive inquiry into the circumstances of the case. For individuals who have never received a favorable expert evaluation, delay in holding trial will generally entail less prejudice than for individuals who have a more substantial basis for arguing they do not satisfy the criteria for SVP commitment. Where an individual makes such a showing, the amount of prejudice may increase as the length of the delay increases. For example, in the case of an individual who has expert reports recommending release, a four-year delay in going to trial will generally be significantly more prejudicial than a one-year delay.

Applying these general principles to Camacho's case, the delay here had no appreciable impact on Camacho's ability to present his defense. In 2015, one out of four expert reports concluded — for the first time ever — that Camacho no longer met the criteria for commitment, and two of the other reports seemed to suggest he might qualify for conditional release in the future. The length of delay since that point — approximately seven years — is significant, and Camacho has been involuntarily committed throughout that period. We therefore find some amount of prejudice in Camacho's case, but no indication that the delay has undermined the fairness of the proceedings. Any prejudice is, moreover, extenuated by the fact

that Camacho has not shown he in fact wanted a timely trial. (See *Barker*, *supra*, 407 U.S. at p. 534 ["More important than the absence of serious prejudice, is the fact that Barker did not want a speedy trial"].)

### E.

Balancing the *Barker* factors, we conclude that Camacho fails to demonstrate a violation of his due process right to a timely trial. Only one factor — the length of the delay — strongly supports Camacho's claim of a due process violation. Though the trial court and the state seemingly neglected their responsibility to bring the case to trial in a timely manner, we agree with the Court of Appeal that the defense, rather than the state, bears more responsibility for the delay. Camacho did not demonstrate a desire to go to trial before 2018, nor did he suffer significant prejudice to his case as a result of the delay. We find no violation of Camacho's due process right to a timely trial.

### V.

Camacho raises an alternative due process argument: that the trial court violated his due process rights by failing to "enact any procedural safeguards to ensure that [he] consented to the repeated delays in his case" during the eight-year period when he did not personally appear. In Camacho's view, if, at any given hearing, an alleged SVP is not "present in court with the opportunity to be heard," due process mandates that "an appropriate written waiver" of personal appearance must be filed.

We decline to hold that due process requires the defendant's personal presence at every hearing, regardless of the substance of the hearing. As a general rule, a criminal defendant has no due process right to be present at hearings

unless "his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." (*Snyder v. Massachusetts* (1934) 291 U.S. 97, 105–106; *id.* at pp. 107–108 ["[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."].) There is no reason to believe a different rule should apply in the SVP context. To require personal presence at every hearing would, moreover, entail transportation and other logistical costs not justified by any substantial benefit. If an individual objects to delays and wishes to assert the right to a speedy or timely trial, he or she may communicate as much through counsel or communicate directly with the court; and courts may consider any difficulties in that communication when determining whether an individual's timely trial right has been violated. (See *Barker*, *supra*, 407 U.S. at p. 529.)

As discussed above, Camacho fails to show that his prolonged absence from court was involuntary. Camacho does not attempt to demonstrate that his presence at any of the hearings held in his absence would have had a "reasonable, substantial relation to his opportunity to defend the charges against him." (*People v. Butler* (2009) 46 Cal.4th 847, 861.) Nor does Camacho allege, much less demonstrate, that his counsel acted against his wishes in seeking trial continuances during periods when Camacho was not personally present. Accordingly, we find no due process violation.

## VI.

Although Camacho fails to establish a violation of his due process rights, the Attorney General concedes that the People and the trial court both could have done more to move the case

along. We agree. It bears emphasis that an individual faced with potential SVP commitment has a due process right to trial at a reasonable time, and the People and trial court both bear responsibility for ensuring that right is respected. The trial court, in particular, has responsibility to exercise its power over trial timing in a manner that takes account of the individual's interests and that adequately guards against unjustified delays.

We have already described what this responsibility entails, including careful compliance with new statutory procedures designed to safeguard against unjustified continuances of previously set trial dates. (Welf. & Inst. Code, § 6603, subd. (c).) In view of the vital importance of ensuring adequate procedures are in place to protect the interests of the defendant, the state, and the public, we further call on the Judicial Council to examine the issue. As the policy and rulemaking body of the courts, the Judicial Council is in the best position to study the issue of pretrial delays in SVP cases with the input of interested persons and consider what, if any, additional safeguards would facilitate timely adjudication of petitions for commitment under the SVP Act.

Here, however, although the trial court and the People should have taken more affirmative steps to bring Camacho to trial, Camacho fails to demonstrate a violation of his due process right to a timely trial on the petition for recommitment under

the SVP Act.  Because the Court of Appeal reached the same conclusion, we affirm its judgment.


**KRUGER, J.**


**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Camacho v. Superior Court

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 1/21/22 – 5th Dist.
**Rehearing Granted**

_____

**Opinion No.** S273391
**Date Filed:** August 31, 2023

_____

**Court:**  Superior
**County:**  Merced
**Judge:**  Ronald W. Hansen

_____

**Counsel:**

Fitzgerald, Alvarez & Ciummo and Douglas C. Foster for Petitioner.

No appearance for Respondent.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Julie A. Hokans, Rachelle A. Newcomb and Sally Espinoza, Deputy Attorneys General, for Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Douglas C. Foster
Fitzgerald, Alvarez & Ciummo
3185 M Street, Suite 200
Merced, CA 95348
(209) 691-7280

Sally Espinoza
Deputy Attorney General
1300 I Street
Sacramento, CA 95814
(916) 210-6282